## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEFAN SACHSENBERG, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | No. 16-cv-5743-VSB |
| | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| PLAINTIFF, | |
| VS. | JURY TRIAL DEMANDED |
| IRSA INVERSIONES Y REPRESENTACIONES SOCIEDAD ANÓNIMA, EDUARDO SERGIO ELSZTAIN, ALEJANDRO GUSTAVO ELSZTAIN, CRESUD SOCIEDAD ANÓNIMA COMERCIAL, INMOBILIARIA, FINANCIERA Y AGROPECUARIA, SAÚL ZANG, and MATÍAS IVÁN GAIVIRONSKY, | |
| DEFENDANTS. | |

Plaintiff Stefan Sachsenberg ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding IRSA Inversiones y Representaciones Sociedad Anónima ("IRSA" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a Class, consisting of all persons other than Defendants who purchased or otherwise acquired IRSA Global Depositary Receipts ("GDRs") between February 11, 2015 and December 30, 2015, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.       Defendant IRSA is an Argentine real estate company that engages in a range of diversified real estate-related activities across the world. It operates through a complicated global web of wholly-owned subsidiaries.  As of June 30, 2015, Defendant Cresud Sociedad Anónima Comercial, Inmobiliaria, Financiera y Agropecuaria ("CRESUD"), a holding company, owns 64.3% of IRSA.

3.       In a purposefully opaque description of relationships, IRSA publically disclosed that, at all times relevant to this case, Defendant Eduardo Sergio Elsztain ("Elsztain") owned a majority, served as chairman of the board, or controlled CRESUD, IRSA, and its component subsidiaries. IRSA's November 17, 2015 Form 20-F for the year 2015 ("2015 20-F"),at 114, states that due to his influence, Defendant Elsztain, who owns 37.4% of CRESUD as of June 30, 2015 (through shares owned by IFISA, Consultores Venture Capital ("IFISA"), and shares he owns directly), is considered to be the beneficial owner of CRESUD.  In turn, he is the beneficial owner of 64.3% of IRSA's common shares. Apart from the Argentine Social Security National Agency (ANSES), which owns 4.5%, there are no other IRSA shareholders that own, beneficially or otherwise, at least 5% of common shares.

4.       Defendant Elsztain serves as majority owner and senior officer of both IRSA and CRESUD.  Elsztain has served as Chief Executive Officer ("CEO") of IRSA since 1991, and beneficially owns a majority of the outstanding common shares of IRSA

(64.3%) through his ownership of CRESUD shares, according to IRSA's 2015 20-F filed November 17, 2015. Defendant Elsztain is also the Chairman of the Board of Directors of IRSA and CRESUD.  Elzstain founded IRSA subsidiary Dolphin Fund Management SA, and is on the board of directors at Dolphin Fund Ltd.  He also owns other affiliate companies with which IRSA does business.

5.      To finance its operations, IRSA engages in borrowings and financing. In 2015 20-F, IRSA described its Global Note Program.  Under the Global Note Program, in 2007 and 2010, the Company issued 10-year, fixed-rate notes, due in 2017 ("2017 Notes") and 2020 ("2020 Notes"), raising $300 million in the two offerings. Both the 2017 Notes and the 2020 Notes are subject to certain debt covenants that are identical in description in IRSA's 20-F filings.  For example, the "coverage of consolidated interest" ratio prohibited IRSA from incurring any new debt or issuing dividends unless its ratio of its consolidated EBITDA[1] over its consolidated interest expense was lower than 1.75.

6.      With the Company bound by the debt covenants from both the 2017 Notes and the 2020 Notes, beginning in May, 2014, through its subsidiaries, IRSA bought shares in IDB Development Corporation Ltd., ("IDBD"), a troubled Israeli real estate company and one of the largest business conglomerates in Israel.  At the time, IDBD showed $6.7 billion of short and long-term debt on its books. By June 30, 2014, IRSA held 26.65% of IDBD.  Through October, 2015, IRSA increased its ownership of IDBD shares, from 23% to 61%, but neither disclosed that it had accumulated over 50% nor consolidated IDBD's financial results with its own as the financial accounting standards that bound it required.

7.      IDBD's 2015 Annual Report, at 51, states that Defendant Elsztain and unrelated investor Mordechai Ben-Moshe became controlling owners of IDBD on May 7,

---

[1] EBITDA is earnings before income tax, depreciation and amortization.

2014.  Note 10 to page F-106 to IRSA's 2015 Form 20-F also states [IRSA] "acquired IDB on May 7, 2014."

8.      The IDBD Q2 2015 filing, at 89, states: "Following the issue of rights to the shareholders of [IDBD], which took place in February 2015, the stake of corporations controlled by Mr. Eduardo Elsztain [DFL, Dolphin Netherlands, and Inversiones Financieras Del Sur S.A. – a Uruguay company wholly owned by IFIS] increased to approximately 61.5% of the Company's issued share capital (as of the reporting date [June 30, 2015] - approximately 66.73%) (the "Dolphin Companies", and together with C.A.A., the "Controlling Shareholders"), while the stake of Mr. Mordechai Ben-Moshe… decreased to approximately 16.2% of the Company's issued share capital … (as compared to their holding rates before the rights issue of approximately 31.3% of the Company's issued share capital by each of the parties)." (emphasis added)

9.      Indeed, once IRSA owned 50% of IDBD shares outstanding, IFRS standards required it to consolidate IDBD's financial statements with its own, including IDBD's relatively huge $6.7 billion of net debt.  By no later than February 10, 2015, through its subsidiaries, IRSA had accumulated at least 50% of IDBD's outstanding shares.

10.     Consolidating IDBD's financial statements into its own, however, posed a major problem for IRSA, requiring IRSA to include IDBD's additional nearly $7 billion in debt as liabilities on its own balance sheet.  In turn, consolidating IDBD's debt with its own would have immediately caused IRSA to violate its debt covenants on the 2017 Notes and the 2020 Notes.

11.     To avoid consolidating the financial statements of IDBD with its own, IRSA purchased its interest in IDBD through its subsidiary Dolphin Netherlands B.V. (of which Elsztain is the chairman of the Board), itself a subsidiary of IRSA's 91.7% owned Bermuda subsidiary Dolphin Fund Ltd. ("DVF") (collectively, "Dolphin"). Simply stated,

4

to record its investment in IDBD as an "investment in associate"[2] – thereby avoiding having to consolidate IDBD – IRSA knowingly or recklessly improperly designated Dolphin as a Venture Capital Organization ("VCO").

12.     IRSA's 2015 20-F states "Dolphin Fund Ltd, is an investment fund incorporated under the laws of Bermuda, whose investment manager is Consultores Venture Capital Uruguay S.A., a company controlled indirectly by our Chairman, Eduardo S. Elsztain." It appears that DFL is majority owned and controlled by Elsztain, who serves as the Chairman of the Board. As of IRSA's 2015 Form 20-F, DFL is 91.57% owned and controlled by IRSA, with its interest indirectly held through Tyrus SA, a stock corporation 100% owned by IRSA and for which Defendant Elsztain serves as chairman of the board. DFL's mutual fund manager (Consultores Venture Capital Uruguay SA is controlled indirectly by Defendant Elsztain) is an entity of IRSA.

13.     Specifically, on May 7, 2014, IRSA acquired 53.3% of the common shares of IDBD.[3] In this transaction, Dolphin invested $272 million for a 50% interest in IDBD, while unrelated entity E.T.H. M.B.M. Extra Holdings Limited ("Extra") acquired the remaining 50%.  Under the terms of the purchase agreement, Dolphin and Extra agreed to participate, jointly and severally, in the capital increases resolved by IDBD's Board of Directors to carry out its business plan for 2014 and 2015.  Dolphin and Extra pledged to participate in amounts of at least NIS[4] 300 million in 2014 and NIS 500 million in 2015. Pursuant to IRSA's Form 20-F, as of June 30, 2014, IRSA's indirect interest in IDBD was approximately 49.0%.

14.     On December 31, 2014, IRSA owned 31% of the common shares of IDBD through Dolphin, and, pursuant to a November 17, 2013 agreement between Dolphin, IRSA, and Extra (the "Shareholders Agreement"), IRSA's 31% ownership interest in

---

[2] IAS 28 "Investments in Associates" provides an exemption from applying the equity method where investments in associates are held through "Venture Capital Organizations" (VCO) or venture capital entities, even when the Group is not a VCO. This type of investment may be accounted for at fair value.
[3] IRSA acquired the shares indirectly, acting through its subsidiaries, DVF and Dolphin Netherlands BV
[4] "NIS" is the New Israeli Shekel.

IDBD entitled it to appoint three of IDBD's nine directors. Subsequently, Dolphin appointed Defendants Elsztain and Zang, and A. Elsztain to the Board of Directors of IDBD.

15.     On February 10, 2015, pursuant to an IDBD-Board approved rights offering, Dolphin acquired approximately 61% of the common shares of IDBD. Extra did not purchase shares in this rights offering. Upon this transaction, as described further below, IRSA effectively controlled a majority of IDBD, requiring IRSA to consolidate IDBD's financial statements with its own.

16.     After the completion of the February 10, 2015 rights offering, that same day, Dolphin sold approximately 12% of the common shares of IDBD to Inversiones Financieras Del Sur Stock Corporation ("IFISA").  Defendant Elsztain owns IFISA and served as its chairman of the board.  IFISA paid cash and a note receivable for approximately 86% of the sale price that it secured with a pledge of its IDBD shares. Defendants described these transactions, in part, in a Form 6-K they filed with the SEC on February 11, 2015, the beginning of the Class Period.

17.     IRSA's 2015 20-F, at 114, states, "Eduardo S. Elsztain is the Chairman of the board of directors of IFIS Limited, a corporation organized under the laws of Bermuda and Inversiones Financieras del Sur S.A.[IFISA], a corporation organized under the laws of Uruguay. Mr. Elsztain, is the beneficial owner of 37.94% of IFIS capital stock, which owns 100% of Inversiones Financieras del Sur S.A.[IFISA]"

18.     On May 28, 2015, pursuant to the Shareholders Agreement, Dolphin elected to purchase all of Extra's IDBD shares.  IRSA did not consolidate IDBD at this time. IRSA also did not report this in a timely fashion to the SEC, and American investors, until it reported on the result of an arbitration proceeding relating to this buyout in a Form 6-K filed on September 25, 2015.  The transaction closed on October 11, 2015, when pursuant to the arbitration process, Dolphin through IFISA purchased all of Extra's IDBD shares bringing IFISA's holdings in IDBD to over 32%. Dolphin also assumed all

the obligations that Extra had, including the obligation to make certain share repurchases during 2015 and 2016.

19.     As a result of these transactions, as of May 28, 2015, Dolphin owned 49% of IDBD and IFISA owned 32% of IDBD, therefore IRSA, through entities related to Defendant Elsztain, (Dolphin and IFISA) collectively own 81% of IDBD shares.  On June 6, IRSA reported in a Form 6-K that it had made additional investments in IDBD on May 28, 2015 and that the "Company's indirect interest, through Dolphin Netherlands B.V., increased to 49% of IDBD's capital stock."

20.     On October 9, 2015, IRSA filed before the SEC a request of relief from the requirement to present full financial statements audited under U.S. GAAS, based on the fact that the Company was unable to force IDBD to provide audited financial statements following such standards. The SEC denied IRSA's request on October 29, 2015. Consequently, IRSA filed a Form 12B-25, Notification of Late Filing of Form 20-F, on November 3, 2015, eventually filing the 2015 20-F on November 17, 2015.

21.     As a result of these transactions, pursuant to the IDBD Q2 2015 filing, at 89), IDBD stated: "Following the issue of rights to the shareholders of [IDBD], which took place in February 2015, the stake of corporations controlled by Mr. Eduardo Elsztain [DFL, Dolphin Netherlands, and Inversiones Financieras Del Sur S.A. – a Uruguay company wholly owned by IFIS] increased to approximately 61.5% of the Company's issued share capital (as of the reporting date [June 30, 2015] - approximately 66.73%) (the "Dolphin Companies", and together with C.A.A., the "Controlling Shareholders") while as of November 17, 2015, when IRSA filed its delinquent 2015 20-F, it still claimed only to own 49% of IDBD and not to control it when, in fact it had owned and controlled IDBD since no later than February 10, 2015.

22.     As of February 10, 2015, according to IDBD and IRSA filings, IRSA owned a majority of the shares and could exercise control over IDBD such that it binding accounting standards required it to consolidate IDBD's financial statements with its own.

In violation of both accounting and reporting standards, IRSA failed both to report its increased ownership in IDBD or the need for it to consolidated IDBD's results with its own.

23.     At the time and through at least the end of the Class Period, IDBD's debt far exceeded IRSA's assets. As of June 30, 2015, IDBD carried $6.7 billion of net debt, including significant short term debt of $6.2 billion, was going through a restructuring process, and had received and published in the 2015 IDBD Annual Report a going concern letter from its auditors.

24.     More, IRSA is contractually obligated to contribute to IDBD $185 million in capital through 2016 in exchange for still more shares.  These contributions would further increase its ownership interest in IDBD.

25.

26.     IRSA hid IDBD's $6.7 billion net debt under the umbrella of Dolphin, by recording its investment in IDBD on its balance sheet as an "investment in associate" and recording changes in its value through its income statement.

27.     IRSA's 2014 20-F stated that IRSA's Global Notes Indenture contains an "Incurrence of Additional Indebtedness" covenant that prohibits its EBITDA to interest ratio to be less than 1.75x, and that this covers both the 2017 Notes and 2020 Notes.  If IRSA had consolidated IDBD's debt in February, 2015, it would have breached this debt covenants at that time.

28.     During the Class Period, Defendants knowingly or recklessly made false and/or misleading statements and/or failed to disclose that: (1) IRSA's subsidiary, DFL, does not adequately qualify as a VCO, and therefore IRSA's subsidiary IDBD's $6.7 billion net debt should have been consolidated with IRSA's financial statements; (2) the required consolidation of IDBD's debt would violate IRSA's Global Notes Indenture, as IRSA would be in breach of the "Incurrence of Additional Indebtedness" covenant, which prohibits its EBITDA to interest coverage ratio to be less than 1.75x; (3) the full

terms of the February 10, 2015 related party transaction between IRSA subsidiary Dolphin and related party corporation IFISA, including the terms of the note; and (4) as a result, the Company's public statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

31.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as IRSA traded on the New York Stock Exchange, which is located within this district, and the trades upon which this action is based, and the subsequent damages, all took place within this District.

32.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

33.     Plaintiff, as set forth in the accompanying Certification, purchased IRSA GDRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

34.      Defendant Eduardo Sergio Elsztain ("Elsztain") is the Chairman of the Board of Directors of IRSA, IDBD and CRESUD, and beneficially owns 37.4% of the outstanding common shares of CRESUD. He has been the Chief Executive Officer ("CEO") of IRSA since 1991, and beneficially owns (through his CRESUD holdings)

64.3% of the outstanding common shares of IRSA. He is also the Chairman of the Board at IRSA subsidiaries IRSA Propiedades Comerciales SA, Agroinvestment SA, Consultores Venture Capital Ltd., Consultores Venture Capital Uruguay SA, Tyrus SA, and IDB Holding Corp. Ltd., and Chairman of the Board at Arcos Del Gourmet SA, BACS Banco de Crédito y Securitización SA, Banco Hipotecario SA (Argentina's leading mortgage bank, of which he is the largest private shareholder), Discount Investment Corp. Ltd., E-Commerce Latina SA, Fundación IRSA. Elzstain founded Dolphin Fund Management SA, and is on the board of directors at Dolphin Fund Ltd.

35.     Alejandro Gustavo Elsztain ("A. Elsztain") is the brother of Defendant Eduardo Sergio Elsztain and has been the Second Vice-Chairman of IRSA since 2001, the Second Vice-Chairman and Chief Executive Officer ("CEO") of CRESUD since 1994, executive vice chairman of IRSA subsidiary IRSA Propriedades Comerciales S.A., and as a director of IDBD.

36.     Defendant IRSA is an Argentine real estate company that engages in a range of diversified real estate-related activities globally. The Company is incorporated in the Republic of Argentina with principal executive offices located at Bolívar 108 (C1066AAB) Buenos Aires, Argentina. It expanded into mortgage lending by purchasing 28% of the formerly state-owned Banco Hipotecario. IRSA's GDRs trade on the NYSE under the ticker symbol "IRS."

37.     Defendant Cresud Sociedad Anónima Comercial, Inmobiliaria, Financiera y Agropecuaria ("CRESUD") is an agricultural company that produces basic agricultural commodities in Brazil and other Latin American countries and beneficially owns 64% of the outstanding common shares of IRSA.  Cresud is a holding company and a leading owner of prime agricultural land in Argentina.  CRESUD's GDRs trade on the NASDAQ under the ticker symbol "CRESY".

38.     Defendant Saúl Zang ("Zang") is an attorney and has been the First Vice-Chairman of IRSA and CRESUD since 1994, and is a director of IDBD and CRESUD.

He is a founding member of the Buenos Aires, Argentina law firm Zang, Bergel y Vines Abogados, where he practices in the areas of real estate, corporate law, and finance.  He served as the former Secretary of the Buenos Aires Stock Exchange.  ."

39.     Defendant Matías Iván Gaivironsky ("Gaivironsky") has served as the Company's Chief Financial Officer ("CFO") and as the CFO of CRESUD since 2011. He also serves as the CFO at IRSA subsidiary IRSA Propiedades Comerciales SA. Gaivironsky obtained a degree in business administration at Universidad de Buenos Aires and has a Master in Finance from Universidad del CEMA.  He has also served as Manager of Capital Markets and Investor Relations of IRSA and Cresud.

40.     The Defendants Elsztain, Gaivironsky, and Zang are sometimes referred to herein as the "Individual Defendants."

41.     Defendant CRESUD, IRSA and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

42.     Defendant IRSA is a real estate company that engages in a range of diversified real estate-related activities across the world. It operates through a complicated global web of wholly-owned subsidiaries.  It in turn is majority-owned by CRESUD, a holding company.

43.     At all times relevant to this Complaint, Defendant Elszstain has controlled and run both Defendants IRSA and CRESUD, serving as the former's CEO since 1991. Personally, he beneficially owns a majority of the outstanding common shares of IRSA. Defendant Elsztain is also the Chairman of the Boards of Directors of both IDBD and CRESUD.  In addition, he founded IRSA's subsidiary Dolphin Fund Management SA, and is on the board of directors at Dolphin Fund Ltd.  He also owns other companies with which IRSA is directly affiliated.

44.     IDB Development Corporation Limited ("IDBD") is an Israeli holding company with interests in businesses across various industries such as agriculture, financial services, real estate, communications and technology.

45.     IFISA is a stock corporation organized under the laws of the Republic Uruguay and a wholly-owned subsidiary of IFIS Limited ("IFIS").

46.     IFIS Limited ("IFIS") is a company incorporated under the laws of Bermuda and registered in Argentina. Defendant Elsztain is Chairman of the Board of IFIS, and beneficially owns 37.94% of IFIS stock. Defendant Elsztain also controls more than 50% of IFIS' voting shares through companies controlled by him and proxies.

47.     For fiscal years 2014 and 2015, IRSA presented its annual and quarterly financial statements in accordance with the International Financial Reporting Standards ("IFRS"), which are issued by the International Accounting Standards Board ("IASB").

48.     From May 7, 2014 (the acquisition date of IDBD) to February 10, 2015, IRSA also increased its ownership of IDBD shares, both directly and indirectly through related-party entities under common control, from 23% to 61%, and consolidated its control over IDBD.

49.     As discussed below, IRSA's increase in share ownership to 61% required IRSA to consolidate IDBD into its financials at least as of February 10, 2015.

50.     IRSA, however, did not consolidate IDBD's results into its own financial statements as of February 10, 2015. IRSA wanted to avoid consolidating the financial statements of IDBD into its own, because to consolidate would mean it was in breach of the debt covenants contained in its Global Notes Indenture.

51.     Like many companies, IRSA engages in borrowing and financing. In its Form 20-F for the fiscal year ended June 20, 2015, it describes IRSA's Global Note Program, under which it issued in 2007 fixed-rate notes due in 2017 for an aggregate amount of up to US$ 150 million, which mature in a single installment on February 2, 2017. It also issued in 2010 fixed-rate notes for an aggregate amount of US$ 150 million

which mature in a single installment on July 20, 2020. Both sets of notes are subject to the following covenants: IRSA will be able to incur in new debts only if financial ratio "coverage of consolidated interest" is higher than 1.75. The coverage of consolidated interest ratio is defined as consolidated EBITDA divided by consolidated interest expense, subject to certain adjustments. EBITDA is defined as operating income plus, depreciation and amortization and considering other consolidated non-cash charges. These notes also contain a covenant limiting IRSA's ability to pay dividends.

52.     Because it made its investments in IDBD through its subsidiary-of its subsidary, Dolphin Netherlands B.V. ("Dolphin"), a shell corporation of its subsidiary Dolphin Fund Limited ("DFL"), a Bermuda trust which was designated a Venture Capital Organization ("VCO") by IRSA, IRSA recorded its investment in IDBD on its balance sheet as an "investment in associate" and recorded changes in its value through its income statement, under IFRS 28.

53.     DFL, however, does not qualify as a VCO.  As discussed below, pursuant to accounting standard IFRS 10, to be defined as a VCO, an entity must: (a) obtain funds from one or more investors for the purpose of providing those investors with investment management services; (b) commit to its investors that its business purpose is to invest funds solely for returns from capital appreciation, investment income, or both, and; (c) measure and evaluate the performance of substantially all of its investments on a fair value basis.

54.     VCOs typically have more than one investment, more than one investor, and those investors are not related parties of the entity, and it has ownership interest in the form of equity. DFL fails the majority of these tests. It does not appear to have outside investors or other venture investments – it is structured as a vehicle to further Elsztain's interests.

55.     Defendant Elsztain indirectly controls DFL's mutual fund manager (Consultore Venture Capital Uruguay SA).  DFL's dominant investor holding 90% of

Class B shares of DFL (Tyrus SA) is 100 percent owned by IRSA. The sole shareholder of Dolphin is Dolphin Investments Gibraltar, Ltd., whose sole shareholder is DFL, and whose directors are defendants Zang and Elsztain.  Finally, venture capital organizations exist to provide start-up capital to ventures that do not have access to the public capital markets. Here, IDBD is a mature Israeli company with access to public markets – the capital provided to IDBD by IRSA is meant to restructure it – it is not a start-up funding situation.

56.    Defendants had a high level of accounting expertise by virtue of their positions and long tenure with the Company. Defendant Eduardo Elsztain has been the Chairman and CEO of IRSA for over a quarter century and serves either as Chairman or in a lead management role for the companies in his business empire. Defendant Gaivironsky is the CFO and during his tenure with the Company, served as the Manager of Capital Markets and Investor Relations of IRSA. Zang is an attorney experienced in corporate finance and capital markets.  Given the size of IRSA's restatement when it admitted that it would have to consolidate, Defendants were aware of their debt covenant requirements and actively directed the acquisition of IDBD shares to be structured in this manner to avoid the inevitable consolidation of IDBD's financial statements with IRSA's financial statements.  Further, Defendants all signed the Section 302 statements appended to IRSA's Form 20-Fs filed with the SEC, in which they certified the financial results of IRSA.

57.    On May 7, 2014, IRSA, acting indirectly through its subsidiary, Dolphin Netherlands B.V., acquired 53.3% of the common shares of IDBD. It did so using Dolphin Netherlands B.V., the shell corporation of DFL.  Dolphin acted in concert with Israeli company  C.A.A. Extra Holdings Limited ("Extra"), controlled by Mordechai Ben Moshé.  In this transaction, Dolphin invested $272 million for a 50% interest in IDBD, while Extra acquired the remaining 50%. Under the terms of the agreement, Dolphin and Extra agreed to participate, jointly and severally, in the capital increases resolved by

14

IDBD's Board of Directors to carry out its business plan for 2014 and 2015. Dolphin and Extra pledged to participate in amounts of at least NIS 300 million in 2014 and NIS 500 million in 2015. As of June 30, 2014, IRSA's indirect interest in IDBD was approximately 23%.

58.      By December 31, 2014, IRSA owned 31% of the common shares of IDBD through Dolphin, and pursuant to an agreement between Dolphin, IRSA, and Extra, dated November 17, 2013 (the "Shareholders Agreement"), IRSA's 31% ownership interest through Dolphin of IDBD gave it the right to appoint three of the nine members of IDBD's Board of directors. Subsequently, Dolphin exercised control and appointed Defendants Elsztain and Zang, and A. Elsztain to the Board of Directors of IDBD.

59.      On February 10, 2015, Dolphin acquired approximately 61% of the common shares of IDBD pursuant to a rights offering approved by the Board of Directors of IDBD. Extra did not purchase shares in this rights offering. Upon this transaction, as described further below, IRSA had effective control over IDBD. IDBD effectively became a subsidiary of IRSA, which required IRSA to consolidate IDBD's financial statements with its own.

60.      After the completion of this rights offering, on February 10, 2015, Dolphin sold approximately 12% of the common shares of IDBD to Inversiones Financieras Del Sur S.A. ("IFISA") for cash and a note receivable secured by the IDBD shares.

61.      As described above, IFISA is a wholly-owned subsidiary of IFIS. Defendant Elsztain is Chairman of the Board of IFIS, and beneficially owns 37.94% of IFIS stock. Defendant Elsztain also controls more than 50% of IFIS' voting shares. According to Israeli court filings filed by Defendant Zang, the purpose of this same-day transaction was so Dolphin would not hold more controlling shares in IDBD than required in order to secure its control over IDBD – indeed the amount of the transaction dropped Dolphin's holdings to 49%. This transaction elevated form over substance, and should have been the impetus for IRSA to consolidate IDBD into its financial statements.

62.    On February 11, 2015, IRSA filed with the SEC a Form 6-K including a translation of "a summary" of a letter – not the original letter itself– that it had filed with the Argentine government securities regulator through the Buenos Aires stock exchange. The Form 6-K announced that it was "important to mention" that the Audit Committee of IRSA approved Dolphin selling 12% of its stake in IDBD to IFISA, a related party transaction. At the time IRSA filed the Form 6-K, describing the purchase of IDBD, Defendants knew, or had access to Company Israeli financial filings suggesting that these public statements on the terms of the purchase were not accurate and omitted a related-party transaction – IRSA did not disclose in the Form 6-K filed on February 11, 2015 with the SEC that IRSA "had accepted a note from IFISA for approximately 86% of the sale price secured by a pledge of the IDBD shares," as consideration for the February 10, 2015 sale of IDBD shares to IFISA from Dolphin, and that IRSA did not disclose the terms of the February 10, 2015 related party transaction between Dolphin and IFISA, as required by IFRS 24, Related Party Disclosures.

63.    On May 28, 2015, pursuant to the Shareholders Agreement, Extra gave notice to Dolphin that Extra was exercising its rights requiring Dolphin to either sell all of its IDBD shares to Extra at a specified price or purchase all of Extra's shares at that specified price under the "buy me buy you" provision. Dolphin elected to purchase all of Extra's IDBD shares, and on October 11, 2015, Dolphin, through IFISA, purchased all of Extra's IDBD shares bringing IFISA's holdings in IDBD to over 32%. Dolphin also assumed all the obligations that Extra had, including the obligation to make certain share repurchases during 2015 and 2016.

64.    As a result of these transactions, Dolphin currently owns 49% of IDBD and IFISA currently owns 32% of IDBD, therefore Dolphin and IFISA collectively (and Defendants IRSA and Elsztain) currently own 81% of IDBD shares.

65.    Further, there are discrepancies in the way in which IDBD and IRSA describe the ownership and control percentages. In the IDBD financial report for Mid-

16

Year 2015, under "Report of the Board of the Directors Regarding The State Of The Company's Affairs," IDBD viewed IRSA's ownership at 66.73%, while as of November 17, 2015, when IRSA filed its delinquent Form 20-F, it still claimed it owned 49% of IDBD and did not control the company.

<u>**Applicable International Financial Reporting Standards**</u>

66.    The transactions detailed above establish IRSA's control over IDBD, and therefore require that IRSA take certain measures to consolidate IDBD's financial statements into its own financial statements, as explained below.

67.    IFRS 10, Consolidated Financial Statements, which applies to annual periods beginning January 1, 2013, sets forth the standards under which a parent entity is required to present consolidated financial statements. IFRS 10 establishes and defines the principle of "control" as the basis for consolidation, and sets forth how that "control" principle is applied to determine whether an investor controls an investee and therefore must consolidate the investee. IFRS 10:1.

68.    According to IFRS 10:7, an investor controls an investee if and only if the investor has all of the following: a) power over the investee (i.e. the investor has existing rights that give it the ability to direct the relevant activities that significantly affect the investor's returns); b) exposure, or rights, to variable returns from its involvement with the investee; and c) the ability to use its power over the investee to affect the amount of the investor's returns. Each of these elements is further explained in the following paragraphs.

69.    In terms of the "power" element, an investor's power arises from rights, which can be straightforward (through voting rights) or be complex (contractual). An investor that only has protective rights cannot have power over an investee and therefore cannot control an investee.

70.    Similarly, in order to control the investee, an investor must have exposure, or have rights, to variable returns from its involvement with an investee.  Such returns

must have the potential to vary as a result of the investee's performance and can be positive, negative or both.

71.    Further, a parent must not only have power over an investee and exposure or rights to variable returns from its involvement with the investee, but must also have the ability to use its power over the investee to affect its returns from involvement with the investee.

72.    Another consideration is whether an investor with decision-making rights acts as a principal or agent of other parties. A number of factors are considered in making this assessment.  For example, the remuneration of the decision maker is one factor considered in determining whether it is an agent.

73.    Even if an investor, such as IRSA, does not exercise its right to appoint a majority of the investee's board, this does not diminish its control over the investee. Pursuant to Paragraph BC97 of IFRS 10, an investor that holds more than half the voting rights of an investee has power over the investee "when those voting rights give the investor the current ability to direct the relevant activities (either directly or by appointing the members of the governing body). The Board concluded that such an investor's voting rights are sufficient to give it power over the investee regardless of whether it has exercised its voting power…."

74.    Further, IAS 24 requires that entities involved in related party transactions during periods covered by financial statements disclose the nature of the related party relationship as well as information about those transactions and outstanding balances (including commitments) necessary for users to understand the potential effect of the relationship on the financial statements.

75.    IAS 24 requires that the disclosure must include, at a minimum: (a) the amount of the transactions; (b) the amount of outstanding balances, including commitments, and: (i) their terms and conditions, including whether they are secured, and the nature of the consideration to be provided in settlement; and (ii) details of any

18

guarantees given or received; (c) provisions for doubtful debts related to the amount of outstanding balances; and (d) the expense recognized during the period in respect of bad or doubtful debts due from related parties.

76.     These disclosures need to be made separately for each of the following categories: (a) the parent; (b) entities with joint control or significant influence over the entity; (c) subsidiaries; (d) associates; (e) joint ventures in which the entity is a venturer; (f) key management personnel of the entity or its parent; and (g) other related parties.

77.     IAS 28 relates to accounting for investments in Associates and Joint Ventures.  It applies to all entities that are investors with joint control of, or significant influence over, an investee (associate or joint venture).  Its objective is  to prescribe the accounting for investments in associates and to set out the requirements for the application of the equity method when accounting for investments in associates and joint ventures.

78.     IAS 28 does not apply to investments in associates held by venture capital organizations. When an investment in an associate or a joint venture is held by, or indirectly through, an entity that is a venture capital organization, or a mutual fund, unit trust, or similar entities including investment-linked insurance funds, that entity may elect to measure investments in those associates and joint ventures at fair value through profit and loss.

79.     IAS 28 presumes significant influence when an entity holds 20% or more (unless it can be clearly demonstrated that it is not the case.) of the voting power (directly or through subsidiaries) on an investee.. An investment entity, as of January 1, 2014 is an entity that satisfies the following three elements: (a) Obtains funds from one or more investors for the purpose of providing these investor(s) with investment management services; (b) commits to its investor(s) that its business purpose is to invest funds solely for returns from capital appreciation, investment income, or both and (c) measures and evaluates the performance of substantially all of its investments on a fair value basis.

80.     In assessing control, an investor shall consider the nature of its relationship with other parties, and whether those parties might be acting on the investor's behalf. IFRS 10, paragraphs B74 and B75 state, in part:

> B74: "…A party is a de facto agent when the investor has, or those that direct the activities of the investor have, the ability to direct that party to act on the investor's behalf. In these circumstances, the investor shall consider its de facto agent's decision-making rights and its indirect exposure, or rights, to variable returns through the de factor agent together with its own when assessing control of an investee."

> B75: "The following are examples of such other parties that, by the nature of their relationship, might act as de facto agents for the investor: (a) the investor's related parties; (b) a party that received its interest in the investee as a contribution or loan from the investor; (c) a party that has agreed not to sell, transfer or encumber its interests in the investee without the investor's prior approval (except for situations in which the investor and the other party have the right of prior approval and the rights are based on mutually agreed terms by willing independent parties); (d) a party that cannot finance its operations without subordinated financial support from the investor; (e) an investee for which the majority of the members of its governing body or for which its key management personnel are the same as those of the investor; and (f) a party that has a close business relationship with the investor, such as the relationship between a professional service provider and one of its significant client."

81.     Applying these concepts here, IDBD became a subsidiary of IRSA as a result of the February, 2015 rights offering, which resulted in an increase in Dolphin's ownership interest to 61% of IDBD's outstanding shares.

82.     IFISA is a related party of Dolphin and Dolphin financed IFISA's purchase of the IDBD shares; accordingly, following paragraphs B74 and B75 of IFRS 10, IFISA is Dolphin's de facto agent and the shares held by IFISA should be attributed to Dolphin, and ultimately towards IRSA's total ownership of IDBD.

83.     Finally, Dolphin's parent, DFL, is not a VCO.  Pursuant to IFRS 10, to be defined as a VCO, an entity must display certain qualities.  An investment entity must (a) obtain funds from one or more investors for the purpose of providing those investors with

20

investment management services; (b) commit to its investors that its business purpose is to invest funds solely for returns from capital appreciation, investment income, or both, and; (c) measures and evaluates the performance of substantially all of its investments on a fair value basis.  These entities have more than one investment, more than one investor, and those investors are not related parties of the entity, and it has ownership interest in the form of equity.

84.     DFL fails the majority of these tests. It does not appear to have outside investors or other venture investments – it is structured as a vehicle to further Elsztain's interests. DFL's mutual fund manager (Consultore Venture Capital Uruguay SA) is controlled indirectly by Defendant Elsztain.  DFL's dominant investor holding 90% of Class B shares of DFL (Tyrus SA) is 100 percent owned by IRSA. The sole shareholder of Dolphin is Dolphin Investments Gibraltar, Ltd., whose sole shareholder is DFL, and whose directors are defendants Zang and Elsztain.

**IDBD Debt and the Effect of Consolidation on IRSA Debt Covenants**

85.     Given that as a result of the February 10, 2015 transactions, IRSA owned a majority of the shares and could exercise control over IDBD such that it was proper to consolidate, but did not, there were other factors affecting IRSA's decision to ignore IFRS 10 and not consolidate IDBD into IRSA.

86.     At the time and through to today, IDBD's debt far exceeds IRSA's assets. As of June 30, 2015,  IDBD carried $6.7 billion of net debt (significant short term debt of $6.2 billion), is going through a restructuring process, and the 2015 IDB Annual Report contains a letter dated March 29, 2016 signed by Defendant and Chairman of the Board Elsztain and CEO Sholem Lapido,  which notes the "going concern" letter from its auditor on the grounds that there is "uncertainty regarding the Company's ability to execute its business plans in an adequate and/or timely manner, and regarding its continued ability to repay its liabilities in an adequate and/or timely manner".

Furthermore, IRSA is contractually obligated to give IDBD $185 million in capital through 2016, which would further increase its ownership interest in IDBD.

87.     Meanwhile, IRSA will have invested roughly $484 million in IDBD, and it is likely facing problems with cash flow, as it deleted language between its 2014 and 2015 Form 20-Fs that stated the Company was "generating sufficient funds from operating cash flows to satisfy our debt service requirements and our capacity to obtain new financing is adequate given the current availability of credit lines with the banks."

88.     IRSA hides IDBD's $6.7 billion net debt under the umbrella of DFL, by recording its investment in IDBD on its balance sheet as an "investment in associate" and recording changes in its value through its income statement, even though IRSA, through entities related to Defendant Elsztain, owns 81% of its subsidiary IDBD.

89.     IRSA did this under a loophole of the IFRS, which permits entities to invest through venture capital organizations ("VCOs"). As discussed above, IA 28 does not apply, and consolidation is therefore not required, where the investment in an associate is held by a VCO – in that instance then the entity may measure investments at fair value through profit and loss, instead of consolidating.

90.     As discussed above, pursuant to IFRS 10, to be defined as a VCO, an entity must display certain qualities.  An investment entity must (a) obtain funds from one or more investors for the purpose of providing those investors with investment management services; (b) commit to its investors that its business purpose is to invest funds solely for returns from capital appreciation, investment income, or both, and; (c) measures and evaluates the performance of substantially all of its investments on a fair value basis.  These entities have more than one investment, more than one investor, and those investors are not related parties of the entity, and it has ownership interest in the form of equity.

91.     For purposes of IAS 28, associates are entities over which the investor has significant influence (generally a 20% rule with expansion). An investment entity, as of

January 1, 2014 is an entity that satisfies the following three elements: (a) Obtains funds from one or more investors for the purpose of providing those investor(s) with investment management services; (b) commits to its investor(s) that its business purpose is to invest funds solely for returns from capital appreciation, investment income, or both and (c) measures and evaluates the performance of substantially all of its investments on a fair value basis.

92.     The 2014 Company Form 20-F stated that IRSA's Global Notes Indenture contains an "Incurrence of Additional Indebtedness" covenant that prohibits its EBITDA to interest ratio to be less than 1.75x, and that this covers IRSA's notes due in 2017 and 2020.  If IRSA had consolidated IDBD's debt in February 2015, it would have breached this debt covenant.

93.     The 2014 20-F stated that IRSA's Global Notes Indenture contains an "Incurrence of Additional Indebtedness" covenant that expressly prohibits its EBITDA to Interest ratio to be less than 1.75x. The 2014 20-F stated in part that:

> IRSA NCN due 2017 and IRSA NCN due 2020 both contain certain customary covenants and restrictions, including amount others, limitations for the incurrence of additional indebtedness, restricted payments, disposal of assets, and entering into certain transactions with related companies.
>
> Under the NCN indentures, IRSA is permitted to incur additional indebtedness provided its coverage of consolidated interest ratio is higher than 1.75. The coverage of consolidated interest ratio is defined as consolidated EBITDA divided by consolidated interest expense, subject to certain adjustments. EBITDA is defined as operating income plus, depreciation and amortization and certain other consolidated non-cash charges. The Group was in compliance with these covenants as of June 30, 2014 and 2013.

94.     On October 31, 2014, the Company filed a Form 20-F for the fiscal year ended June 30, 2014 (the "2014 20-F") with the SEC, providing the Company's year-end financial results and position and stating that the Company's internal control over

financial reporting was effective as of June 30, 2014. The 2014 20-F was signed by Defendant Gaivironsky.

95.     The 2014 20-F also contained signed SOX certifications required pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Elsztain and Gaivironsky attesting to the accuracy of financial reporting.

96.     The 2014 20-F stated that Dolphin (defined as both DFL and Dolphin Netherlands B.V.) qualifies as a VCO under IAS 28, stating "As Dolphin is a subsidiary that qualifies as a VCO under the exemption contained in IAS 28 mentioned in Note 2.3 (d), we have valued our interest in IDBD at fair value with changes in the income statement."

*     *     *

Venture Capital Organization

We generally account for our investments in associates under the equity method. However, IAS 28 "Investments in Associates" provides an exemption from applying the equity method where investments in associates are held through "Venture Capital Organizations" (VCO) or venture capital entities, as defined in Spanish, even when we are not a VCO. This type of investment may be accounted for at fair value with changes in net income for the years because such measure proves to be more useful to users of financial statements than the equity method.

**Materially False and Misleading Statements**

97.     On February 11, 2015, the beginning of the Class Period, the Company filed a Form 6-K with the SEC announcing that Dolphin acquired the common shares of IDBD pursuant to a rights offering approved by the Board of Directors of IDBD, which amounted to approximately 61% of IDBD, and after Dolphin sold 12% of its shares in IDBD to IFISA, and thereafter IRSA held an indirect stake of 49% in IDBD:

By letter dated February 11, 2015, and continuing with the communication released on February 2, 2015, the Company informs that, effectively made

an investment in Dolphin Netherlands B.V for the amount of USD 105 million. Addtionally the Company, as a result of its indirect participation through Dolphin Netherlands B.V in the rights offering made by IDBD and the sale to Inversiones Financieras del Sur S.A ("IFISA")., increased its indirect stake to 49% of IDBD outstanding shares. Related to the previous paragraph it is important to mention that Dolphin Netherlands B.V has sold 12% of its stake in IDBD to IFISA, related party transaction approved by the Audit Committee of the Company.

98.    On June 17, 2015, the Company filed a Form 6-K with the SEC announcing its third quarter results for the period ended March 31, 2015 ("2015 3Q"), disclosing that through a related party transaction with IFISA, IRSA had trade and other receivables from IFISA totaling ARS 191.8 million. The 2015 3Q was signed by Defendant Zang.

99.    On October 9, 2015, IRSA filed before the SEC a request of relief from the requirement to present full financial statements audited under U.S. GAAS of an associate accounted for using the fair value option on Form 20-F, pursuant to Rule 3-09 of Regulation S-X, based on the fact that the Company was unable to force its associate, IDBD Holdings Corporation Ltd. ("IDBD") to provide audited financial statements following such standards.

100.    In lieu of the required information IRSA offered to present full financial statements audited under Israel GAAS, which were available.

101.    On October 29, 2015, IRSA received a response from the staff of the SEC denying IRSA's request.

102.    On November 3, 2015, the Company filed a Form 12B-25 notifying the SEC that it was unable to file its Annual Report on Form 20-F for the year ended on June 30, 2015 by the required date without unreasonable effort or expense, and stated the following reasons:

(i) On October 9, 2015, IRSA filed before the SEC a request of relief from the requirement to present full financial statements audited under U.S. GAAS of an associate accounted for using the fair value option on

Form 20-F, pursuant to Rule 3-09 of Regulation S-X, **based on the fact that the Company was unable to force its associate, IDBD Holdings Corporation Ltd. ("IDBD") to provide audited financial statements following such standards**. In lieu of the required information IRSA offered to present full financial statements audited under Israel GAAS, which are already available. **On October 29, 2015, IRSA received a response from the staff of the SEC denying IRSA's request**. Consequently, IRSA will need additional time to request and obtain the US GAAS audit report for IDBD.

[Emphasis added].

103.     On November 17, 2015, the Company filed a Form 20-F for the fiscal year ended June 30, 2015 (the "2015 20-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of June 30, 2015. The 2015 20-F was signed by Defendant Gaivironsky. The 2015 20-F also contained signed SOX certifications by Defendants Elsztain and Gaivironsky attesting to the accuracy of financial reporting.

104.     The 2015 20-F stated that IRSA does not control IDBD or its management, stating in part:

We have been unable to obtain financial statements for IDBD for the year ended December 31, 2014 audited in accordance with auditing standards generally accepted in the United States ("U.S. GAAS") that may be required to be included in this Annual Report on Form 20-F by Rule 3-09 of Regulation S-X ("Rule 3-09"). As of June 30, 2015, we held 49% of IDBD and, as such, **we did not control IDBD and did not have the power to direct IDBD or its management** to provide us with such audited consolidated financial statements.

[Emphasis added].

105.     The 2015 20-F stated that IRSA's Global Notes program contains an "Incurrence of Additional Indebtedness" covenant that expressly prohibits its EBITDA to Interest ratio to be less than 1.75x. The 2015 20-F stated in part:

Under the NCN indentures, IRSA is permitted to incur additional indebtedness provided its coverage of consolidated interest ratio is higher

than 1.75. The coverage of consolidated interest ratio is defined as consolidated EBITDA divided by consolidated interest expense, subject to certain adjustments. EBITDA is defined as operating income plus, depreciation and amortization and certain other consolidated non-cash charges.

[Emphasis added].

106.    The 2015 20-F also stated that Dolphin qualifies as a VCO under IAS 28, stating "As DFL is a subsidiary that qualifies as a VCO under the exemption contained in IAS 28 mentioned in Note 2.3 (d), we have valued our interest in IDBD at fair value with changes in the income statement."

107.    The statements referenced in ¶¶ 97-106 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose the following:

108.    (1) DFL does not qualify as a VCO. DFL fails the majority of these tests. It does not appear to have outside investors or other venture investments – it is structured as a vehicle to further Elsztain's interests. DFL's mutual fund manager (Consultore Venture Capital Uruguay SA) is controlled indirectly by Defendant Elsztain.  DFL's dominant investor holding 90% of Class B shares of DFL (Tyrus SA) is 100 percent owned by IRSA. The sole shareholder of Dolphin is Dolphin Investments Gibraltar, Ltd., whose sole shareholder is DFL, and whose directors are defendants Zang and Elsztain. Finally, venture capital organizations exist to provide start-up capital to ventures that do not have access to the public capital markets. Here, IDBD is a mature Israeli company with access to public markets – the capital provided to IDBD by IRSA is meant to restructure it.  Therefore, IDBD's $6.7 billion net debt should be consolidated with IRSA's financial statements; (2) the impending consolidation of IDBD's debt would violate IRSA's Global Notes Indenture, as IRSA would be in breach of the "Incurrence of

Additional Indebtedness" covenant, which prohibits its EBITDA to interest coverage ratio to be less than 1.75x and the consolidation would force the ratio closer to 1.25x, below the required level; (3) the terms of the February 10, 2015 related party transaction between Dolphin and IFISA which hid the control IRSA had over IDBD; and (4) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge:

109.    On November 19, 2015, *Spruce Point Capital Management* published an investment research report on the Company ("Spruce Point Report") warning that IRSA was in danger of breaching its debt covenants due to its convoluted ownership of IDBD, which was burdened with $6.7 billion of net debt:

> •      IRSA (NYSE: IRS) is a Latin American real estate company. IRSA recently invested $300m+ in IDB Development Corp. (TLV: IDBD), an Israeli holding company with interests in real estate, communications, agricultural products, insurance and technology. **IDBD is burdened with $6.7 billion of net debt, going through a restructuring process, and has a "going concern" warning from its auditor**. It is dependent on further capital injection commitments from IRSA of approximately $185m through 2016

> •      Together with IFISA, a related-party and controlled entity of IRSA's Chairman, it appears that IRSA owns 81% of IDBD, a controlling stake that should trigger IDBD being consolidated into the financial results of IRSA. IRSA claims that it only owns 49%. The additional capital injections of $185m will only increase the aforementioned ownership stake above the current level

> •      IRSA has used a narrow loophole in International Financial Reporting Standards ("IFRS") accounting to avoid consolidation by designating its IDBD investment through Dolphin Fund, a subsidiary designated a Venture Capital Organization ("VCO"). In our opinion, this is a grossly flawed accounting application to avoid consolidation and we've provided documentary evidence that calls into question Dolphin's status as a VCO. **Upon consolidation, we estimate IRSA's pro forma Net Debt / EBITDA leverage to be 8.6x**

•   Under IRSA's outstanding Global Notes indenture, **a consolidation of IDBD's debt would result in a covenant breach of its EBITDA to interest coverage ratio of 1.75x** (we estimate pro forma 1.25x). At its October shareholder meeting, IRSA took the necessary steps to issue a further $300m in Global Notes, perhaps as means to fund its IDBD capital injections. A covenant breach would impede this issuance

•   In a November NT 20-F filing (a request for an extension to file its annual report), IRSA suggested that the SEC may be currently investigating the consolidation issue by requiring IDBD financial statements audited under US GAAS. The SEC denied its request to Israeli GAAS statements instead**. In its new 20-F filing, IRSA included a big risk factor that its inability to provide such audited financials would "materially adversely affect" its ability its access to capital markets, and may ultimately result in the delisting of its shares.**

•   IRSA trades at 3.6x book value, an irrational price given the apparent covenant breach and debt issues upon IDBD consolidation. **If IRSA traded at 1x book value, its stock would be worth $4.75 per ADR (approx. 70% downside)**

•   IRSA is 64% owned by Cresud (Nasdaq: CRESY). CRESY's stock trades parallel to IRSA's and could fall to $4.00 per ADR (-70%)

[Emphasis added].

110.   The Spruce Point Report also asserted that DFL does not qualify as a VCO, and therefore IDBD's $6.7 net debt should be consolidated with IRSA's financial statements, stating, in part:

In our opinion, IRSA's Dolphin Fund VCO entities bear no resemblance to a venture fund by any stretch of the imagination. In short, we believe the designation as a VCO is grossly inappropriate and designed to avoid consolidating IDBD's $6.7 billion of net debt on to IRSA's books

**We Believe IDBD Should Be Consolidated Into IRSA's Financials:**
IRSA's accounting choice appears designed for one thing; to avoid consolidation of IDBD into its financials. We can understand why; IDBD is massively levered with $6.7 billion of net debt outstanding as of 6/30/15. Despite IRSA having already injected $300m+ into IDBD since 2014, IDBD still has received a "going concern" warning from its auditor as of 6/30/15. IRSA has commitments to inject a further $185m into IDBD through 2016.

\*      \*      \*

Our interpretation of Dolphin and its entities suggest that it is not a Venture Capital Organization

\*      \*      \*

Dolphin Funds Ltd. Is Really Just An Entity Controlled For IRSA's Benefit

\*      \*      \*

RSA should be reporting to the SEC the activities of IDBD, a material subsidiary which we believe should be consolidated. To illustrate, IRSA's total assets as of 6/30/15 were approximately $960m (adjusted to exclude reporting IDBD as an associate). IDBD's assets totaled $10.5 billion at 6/30/15 or 11x larger than IRSA's assets!

\*      \*      \*

We Believe IRSA Should Consolidate IDBD's Mountain of Debt

[Emphasis added].

111.    The Spruce Point Report asserts that IRSA, and entities related to Defendant Elsztain such as, Dolphin, DFL, IFIS, and IFISA, own 81% of IDBD's shares and therefore effectively control IDBD. The report states in part:

> **Egregious Accounting For IRSA's Controlling Investment in IDB Holdings:** Our close examination of the facts and circumstances suggest that IRSA has majority control of IDBD through related-party entities under common control that have accumulated 81% of IDBD's shares.
>
> \*      \*      \*
>
> **Plenty of Related Party Deals To Consider:** IRSA makes numerous disclosures about related-party transactions. IRSA has the largest list of related-party transactions that Spruce Point has, to date, ever seen! To illustrate, IRSA's 2015 20-F Note 37 to the financial statements include 17 pages (F180 to F197) of related party disclosures! We have found instances of related party transactions not adequately described to IRSA investors.
>
> \*      \*      \*

> In our opinion, the net effect is that IRSA now owns 81% through its common control interests in Dolphin and IFISA and has the right to appoint an additional three Board members (for a total of six of nine)
>
> \*          \*          \*
>
> We estimate that Dolphin, IFISA, and entities related to Eduardo Elsztain now own approximately 81% of IDBD (vs. 49% reported in its SEC financial filings), and clearly has control of IDBD

[Emphasis added].

112.    The Spruce Point Report also asserts that IDBD itself views IRSA's ownership in IDBD at 66.73%. It cited to IDBD's Mid-Year 2015 Report that after the transactions in February 2015, the rate of holdings of the corporations controlled by Elsztain (through Dolphin, Dolphin Netherlands, and Inversiones Financieras Del Sur S.A.) increased to approximately 61.5% of the issued capital of IDBD, and that it was closer to 66.73% as of the date of the IDBD report.  This is in contrast to IRSA's late November 17, 2015 Form 20-F filing in which it claimed that it owned 49% of IDBD and did not control IDBD.

113.    The Spruce Point Report also asserts that Defendant Zang, in Israeli court filings, acknowledged that Dolphin indeed controls IDBD, adding a screenshot of an Israeli legal affidavit providing evidence of control of IDBD, in that it was only after the injection of capital from Dolphin to IDBD was complete that Dolphin sold a portion of its shares to IFISA to drop below a majority to 49% shares held, Zang stating that "this transaction was executed due to internal considerations of Dolphin, which prefers... not to hold more controlling shares than is required to secure its control over IDBD":



114. On the consolidation of IDBD's debt into IRSA, the Spruce Point Report asserts that consolidation would violate IRSA's Global Notes Indenture, because if it moved to consolidate, IRSA would be in breach of the "Incurrence of Additional Indebtedness" covenant, which prohibits its EBITDA to interest coverage ratio to be less than 1.75x. Spruce Point estimated the ratio pro forma at 1.25x.

115. The Spruce Point Report also asserts that IRSA did not disclose in the Form 6-K filed on February 11, 2015 with the SEC that IRSA "had accepted a note from IFISA (Elsztain-controlled entity) for approximately 86% of the sale price secured by a pledge of IDBD shares," as consideration for the February 10, 2015 sale of IDBD shares to IFISA from Dolphin, and that IRSA did not disclose the terms of this related party transaction between Dolphin and IFISA, that effectively financed IFISA's purchase of IDBD shares, as required by IFRS 24, Related Party Disclosures.

116.    Finally, the Spruce Point Report asserts that "IDBD became a subsidiary of IRSA as a result of the February 2015 rights offering, which resulted in an increase in Dolphin's ownership interest to 61% of IDBD's outstanding shares", and asserts that "[b]ecause IFISA is a related party of Dolphin and because Dolphin financed IFISA's purchase of the IDBD shares, we believe that, in accordance with paragraphs B74 and B75 of IFRS 10, IFISA is Dolphin's de facto agent and the shares held by IFISA should be attributed to Dolphin, and ultimately IRSA's total ownership of IDBD".

117.    On this news, shares of IRSA fell $1.61 per share or approximately 10% to close at $15.06 per share on November 20, 2015.

**Additional False and Misleading Statements**

118.    On November 20, 2015, IRSA issued a press release denying the Spruce Point Report, stating in part:

> Eduardo Elsztain, Chief Executive Officer of IRSA, said, "We stand by the accuracy and integrity of our financial statements, which were audited by internationally-recognized external accountant firms, and our regulatory filings. We disagree with the short-seller fund's uninformed implication that we might not have complied with our obligations under our debt instruments. This, quite simply, is not the case. IRSA is proud of its decades-long track record of compliance, and transparency in the international capital markets and categorically rejects any self-serving suggestion to the contrary."

119.    On November 24, 2015, IRSA issued a press release further "complementing" the November 20, 2015 press release, which states in part:

> The Company affirms the accuracy of (i) its consolidated financial statements as of and for its fiscal year ended June 30, 2015 which were audited by Price Waterhouse & Co S.R.L. and (ii) its unaudited consolidated financial statements as of and for the three-month period ended September 30, 2015. IRSA's audited annual and unaudited quarterly consolidated financial statements were prepared in accordance with IFRS.

> For the reasons summarized below, and in accordance with IFRS, IRSA did not consolidate IDBD in such financial statements.

At both June 30 and September 30, 2015, IRSA had an indirect 49% interest in IDBD. On June 30, 2015 and September 30, 2015, IFISA held an interest of 37.39% and 36.76%, respectively, in Cresud, which on both dates held a 64.3% interest in IRSA. Additionally, IFISA held an interest of 17.7% in IDBD on both dates. At both June 30 and September 30, 2015, IRSA, IFISA and Mr. Mordechai Ben-Moshe ("MBM") were parties to a joint control agreement (the "Joint Control Agreement") with respect to their respective investments in IDBD. Therefore, IRSA did not have effective control over IBDB on either of such dates. For this reason, and in accordance with IFRS, IRSA did not consolidate IDBD in its annual or most recent unaudited quarterly consolidated financial statements.

On October 11, 2015, IFISA (not IRSA) acquired shares representing an additional 14% of IDBD, and on such date the Joint Control Agreement was terminated. Due to the October 11 termination of the Joint Control Agreement, IRSA is currently assessing whether or not it should begin to consolidate IBDB commencing on the date as of which the Elsztain group (i.e., IFISA, IRSA and related companies) obtained effective control over IDBD. No conclusion has been reached yet.

On October 9, 2015, IRSA filed with the SEC a request for a waiver of the provisions of Rule 3-09 of Regulation S-X which would require IRSA to include in its annual report on Form 20-F the separate financial statements of IDBD as of and for the year ended December 31, 2014 audited in accordance with US GAAS. IRSA filed this waiver request because IDBD does not have US GAAS financial statements, and IRSA believes that their preparation would take time and would impose an undue economic burden on IRSA. This issue is unrelated to IRSA's consolidation analysis. IRSA has no reason to believe that the SEC is conducting any kind of investigation with respect to IRSA's financial statements or otherwise.

120.   In the November 24, 2015 press release, IRSA addressed the claims regarding the effect of IDBD's debt on IRSA's debt covenants.  The release does not address the need for consolidation. It states in part:

All of IDBD's Debt is Non-Recourse to IRSA.

Irrespective of whether IRSA consolidates IDBD's indebtedness in its future financial statements, none of such indebtedness is guaranteed by IRSA or secured by any of IRSA's assets. All of IDBD's indebtedness is non-recourse to IRSA.

IRSA Has Complied with its Debt Covenants.

IRSA's outstanding indebtedness includes its local bonds, its US$150 million Notes due 2017 and its US$150 million Notes due 2020. IRSA's debt instruments contain certain incurrence (not maintenance) covenants that limit the incurrence of indebtedness. IRSA has carefully reviewed all its debt agreements and believes that it is in compliance with all applicable covenants and, assuming no increase in IRSA's shareholding in IDBD, will remain in compliance even if it consolidates IDBD in its future financial statements.

121.    The statements referenced in ¶¶ 118-120 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Dolphin does not adequately qualify as a VCO, and therefore IDBD's $6.7 billion net debt should be consolidated with IRSA's financial statements; (2) the impending consolidation of IDBD's debt would violate IRSA's Global Notes Indenture, as IRSA would be in breach of the "Incurrence of Additional Indebtedness" covenant, which prohibits its EBITDA to interest coverage ratio to be less than 1.75x; (3) the terms of the February 10, 2015 related party transaction between Dolphin and IFISA; and (4) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Finally Emerges

122.    On December 30, 2015, after the close of trading, IRSA filed with the SEC a Report of Foreign Issuer on Form 6-K, stating that it would start consolidating IDBD in its financial statements since October 11, 2015, the "date in which the group controlled by Eduardo Sergio Elsztain took effective control of IDBD."  In the filing the Company claimed "It is important to clarify that none of IDBD indebtedness is guaranteed by IRSA or secured by any of IRSA's assets. All of IDBD's indebtedness is non-recourse to IRSA."

35

123.    The December 30, 2015 Form 6-K did not mention the impact of consolidation on IRSA's own debt covenants.

124.    On this news, shares of IRSA fell $0.08 per share to close at $12.30 per share on December 31, 2015.

125.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired IRSA securities that traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

127.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IRSA securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IRSA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

128.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

129.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

130.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IRSA;

- whether the Individual Defendants caused IRSA to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of IRSA securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

131.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

132.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- IRSA securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold IRSA securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

133.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

134.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

135.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

137.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of IRSA securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire IRSA securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

138.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for IRSA securities. Such reports, filings, releases and statements were materially false and misleading in that

39

they failed to disclose material adverse information and misrepresented the truth about IRSA's finances and business prospects.

139.    By virtue of their positions at IRSA, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

140.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of IRSA, the Individual Defendants had knowledge of the details of IRSA's internal affairs.

141.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of IRSA. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to IRSA's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for IRSA's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning IRSA's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired IRSA securities at artificially inflated prices and relied upon the price of the securities, the

integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

142.    During the Class Period, IRSA's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of IRSA securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of IRSA securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of IRSA's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

143.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

144.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants and CRESUD**

145.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.     During the Class Period, the Individual Defendants and CRESUD participated in the operation and management of IRSA, and conducted and participated, directly and indirectly, in the conduct of IRSA's business affairs. Because of their senior positions and as a parent company, they knew the adverse non-public information regarding IRSA's business practices.

147.     As officers and/or directors and/or as the parent company of a publicly owned company, the Individual Defendants and CRESUD had a duty to disseminate accurate and truthful information with respect to IRSA's financial condition and results of operations, and to correct promptly any public statements issued by IRSA which had become materially false or misleading.

148.     Because of their positions of control and authority as senior officers and as a parent company, the Individual Defendants and CRESUD were able to, and did, control the contents of the various reports, press releases and public filings which IRSA disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants and CRESUD exercised their power and authority to cause IRSA to engage in the wrongful acts complained of herein. The Individual Defendants and CRESUD therefore, were "controlling persons" of IRSA within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of IRSA securities.

149.     Each of the Individual Defendants and CRESUD, therefore, acted as a controlling person of IRSA. By reason of their senior management positions and/or being directors and/or being the parent company of IRSA, each of the Individual Defendants and CRESUD had the power to direct the actions of, and exercised the same to cause,

42

IRSA to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants and CRESUD exercised control over the general operations of IRSA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

150.   By reason of the above conduct, the Individual Defendants and CRESUD are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IRSA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 13, 2016                    Respectfully submitted,

                                            THE ROSEN LAW FIRM, P.A.

                                            By: /s/ Laurence Rosen
                                               Laurence M. Rosen, Esq.
                                               275 Madison Avenue, 34th Floor
                                               New York, New York 10016
                                               Tel: (212) 686-1060
                                               Fax: (212) 202-3827
                                               Email: lrosen@rosenlegal.com