USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ____9/10/2018____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                        :

STEFAN SACHSENBERG, *individually and*  :
*on behalf of all others similarly situated,*   :
                                          :

                  Plaintiff,  :        16-CV-5743 (VSB)
                                          :

            - against -        :        **OPINION & ORDER**
                                          :

IRSA INVERSIONES Y                 :
REPRESENTACIONES SOCIEDAD      :
ANÓNIMA, EDUARDO SERGIO       :
ELSZTAIN, CRESUD SOCIEDAD      :
ANÓNIMA COMERCIAL, INMOBILIARIA, :
FINANCIERA Y AGROPECUARIA, SAÚL  :
ZANG, and MATÍAS IVÁN GAIVIRONSKY,:
                                          :

                  Defendants.  :
                                          :

-------------------------------------------------------X

Appearances:

Jacob A. Goldberg
Keith Robert Lorenze
The Rosen Law Firm, P.A.
Jenkintown, Pennsylvania
*Counsel for Lead Plaintiff Stefan Sachsenberg*

Bryce L. Friedman
George S. Wang
Simpson Thacher & Bartlett LLP
New York, New York

Stephen J. Kastenberg
Thomas W. Hazlett
Ballard Spahr LLP
Philadelphia, Pennsylvania
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

       In this putative class action, lead plaintiff Stefan Sachsenberg alleges that Defendants

IRSA Inversiones y Representaciones Sociedad Anónima ("IRSA") and Cresud Sociedad

Anónima Comercial, Inmobiliaria, Financiera y Agropecuaria ("Cresud"), along with certain

officers and/or directors of IRSA and Cresud—Eduardo Sergio Elsztain, Saúl Zang, and Matías

Iván Gaivironsky ("Individual Defendants")—violated §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the United States

Securities and Exchange Commission's corresponding rule, 17 C.F.R. § 240.10b-5 ("Rule 10b-

5").  Plaintiff alleges that Defendants made materially false and misleading statements to

investors.  Before me is Defendants IRSA and Cresud's ("Movants") motion to dismiss the

Amended Class Action Complaint For Violations Of Federal Securities Laws ("CAC") pursuant

to Federal Rules of Civil Procedure 12(b)(6) and 9(b).[1]  For the reasons that follow, Movants'

motion to dismiss is GRANTED.

## I.     **Background**[2]

IRSA is an Argentine real estate company that engages in a range of diversified real

estate-related activities across the world.  (CAC ¶¶ 2, 36.)  Cresud is an Argentine company that

is a leading owner of prime agricultural land in Argentina, producing basic agricultural

---

[1] Only IRSA and Cresud have been served with a summons and complaint in this action.  Thus, only those two Defendants have appeared in the case and are movants on this motion.  Under Federal Rule of Civil Procedure 4(m), the court must dismiss an action without prejudice against a defendant who is not served within 120 days of the filing of a complaint or order that service be made within a specified time.  Fed. R. Civ. P. 4(m); *see also Zapata v. City of New York*, 502 F.3d 192, 194 (2d Cir. 2007).  That time period elapsed long ago for the Individual Defendants.  However, Rule 4(m) also directs the court to extend the time for service where a plaintiff "shows good cause for the failure" to serve.  Fed. R. Civ. P. 4(m).  Accordingly, Plaintiff is directed to file a letter on or before September 24, 2018, explaining whether there is good cause for his failure to serve the Individual Defendants.  Plaintiff's letter should also specify whether any of the Individual Defendants are located in a foreign country, in which case Rule 4(m), by its own terms, would not apply.  *See Standard Commercial Tobacco Co. v. Mediterranean Shipping Co., S.A.*, No. 94 CIV. 7040(PKL), 1995 WL 753901, at *1 (S.D.N.Y. Dec. 19, 1995) ("Rather, where service is in a foreign country, the Court uses a flexible due diligence standard to determine whether service of process is timely.").  If any of the Individual Defendants is located in a foreign country, Plaintiff should explain in his letter whether this due diligence standard is met as to those defendants.  I note that it is likely that even if Plaintiff's service on the Individual Defendants is deemed timely, Plaintiff's claims against the Individual Defendants will fail for the same reasons that his § 20(a) claim fails against Cresud.  (*Infra* Section IV.C.)

[2] The following factual summary is drawn from the allegations of the CAC, (Doc. 24), unless otherwise indicated, which I assume to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My references to these allegations and exhibits should not be construed as a finding as to their veracity, and I make no such findings.

commodities in Latin American countries.  (*Id.* ¶ 37.)  Cresud beneficially owns 64% of the outstanding common shares of IRSA.  (*Id.*)

On May 7, 2014, IRSA, together with non-party E.T.H. M.B.M Extra Holdings Limited ("Extra"), jointly acquired an interest in IDB Development Corporation Limited ("IDBD"), an Israeli holding company.  (*Id.* ¶¶ 13, 44.)  IRSA invested in IDBD through its subsidiary, Dolphin Netherlands B.V. ("Dolphin"), and Dolphin and Extra jointly acquired a total of 53.3% of the outstanding shares in IDBD.  (*Id.* ¶¶ 13, 52, 57; Wang Decl. Ex. 1, at 15.)[3]  In this transaction, Dolphin and Extra each held 50% of the joint interest in IDBD.  (CAC ¶ 13; Wang Decl. Ex. 1, at 15.)

Pursuant to a shareholders agreement dated November 17, 2013 ("Shareholders Agreement"), IRSA was entitled to appoint three of nine directors on the IDBD Board of Directors ("IDBD Board").  As of December 31, 2014, Dolphin had appointed Alejandro Elsztain (a non-party) and Defendants Elsztain and Zang to the IDBD Board.  (CAC ¶ 14; Wang Decl. Ex. 4, at 13.)  Dolphin and Extra also agreed to participate, jointly and severally, in the capital increases agreed to by the IDBD Board through resolution to carry out its business plan for 2014 and 2015, (CAC ¶ 13), and "pledged to participate" in tender offers for the acquisition of shares of IDBD for a total of approximately $150 million during the years 2014 to 2016, (*id.* ¶¶ 13, 57).

On February 10, 2015, pursuant to a rights offering approved by the IDBD Board ("Rights Offering"), Dolphin acquired approximately 61% of the common shares of IDBD. (CAC ¶ 15; Wang Decl. Ex. 3.)  Extra did not purchase shares in the Rights Offering.  (CAC

---

[3] "Wang Decl." refers to the Declaration of George S. Wang in Support of Defendants IRSA and Cresud's Motion to Dismiss the Amended Class Action Complaint.  (Doc. 28.)

¶ 15.)  Later in the day after the Rights Offering was completed, Dolphin sold approximately

12% of the common shares of IDBD to a related party, Inversiones Financieras Del Sur Stock

Corporation ("IFISA").  (CAC ¶ 16; Wang Decl. Ex. 3.)  IRSA publicly disclosed these

transactions on February 11, 2015.  (Wang Decl. Ex. 3.)

Following the Rights Offering, Extra demanded from Dolphin that Extra be permitted to

acquire its pro rata portion of IDBD shares acquired by Dolphin in the Rights Offering—*i.e.*,

50% of the shares.  (Wang Decl. Ex. 5, at 15.)  By February 26, 2015, Extra and Dolphin had

agreed to arbitrate Extra's demand for its pro rata portion of the shares.  (CAC ¶ 18; Wang Decl.

Ex. 5, at 15; Wang Decl. Ex. 7, at 27; Wang Decl. Ex. 8, at 26.)

On May 28, 2015, Extra activated the "Buy Me Buy You" ("BMBY") provision in the

Shareholders Agreement.  (CAC ¶ 63; Wang Decl. Ex. 7, at 28.)  The BMBY clause provides

that each party to the Shareholders Agreement can offer to the other shareholder to acquire or

sell the shares it holds in IDBD at a fixed price.  (CAC ¶ 63; Wang Decl. Ex. 7, at 28.)  The

arbitration between Dolphin and Extra proceeded to determine whether Dolphin or Extra would

be the purchaser of the other's IDBD shares under the BMBY clause.  (Wang Decl. Ex. 7, at 28.)

Prior to that meeting, on June 28 and June 30, 2015, Extra submitted a motion to the

arbitrator seeking an injunction to prevent changes to the IDBD Board at the shareholders'

meeting to be held on July 7, 2015.  (*Id.* at 28, 34.)  On July 6, 2015, the arbitrator granted

Extra's motion.  (*Id.* at 34.)  Dolphin was therefore prohibited from appointing any additional

directors to the IDBD Board beyond the three it had appointed immediately following its original

IDBD investment in 2014.

On September 24, 2015, the arbitrator issued the arbitration award related to the BMBY

clause, and determined that Dolphin and IFISA should be designated as buyers and Extra

designated as the seller.  (*Id.*)  Accordingly, Extra sold all of its IDBD shares to IFISA on October 11, 2015, and the members of the IDBD Board appointed by Extra resigned.  (*Id.* at 35.) IRSA disclosed its dispute with Extra, the arbitration, and arbitrator's award in public disclosures between June 17 and November 17, 2015.  (*Id.* Ex. 5, at 15; *id.* Ex. 6; *id.* Ex. 7, at 27–28, 34–35.) Following the acquisition of Extra's shares of IDBD, IRSA also disclosed that it was "assessing . . . the impact of the closing of the BMBY process with IFISA as the purchaser of the shares of IDBD held by Extra."  (*Id.* Ex. 7, at 35.)

On November 19, 2015, Spruce Point Capital Management ("Spruce Point"), a short seller hedge fund, released a 46-page investment research report on IRSA ("Spruce Point Report"), warning that IRSA was in danger of breaching its debt covenants and recommending a "strong sell" of all IRSA and Cresud securities.  (CAC ¶ 109; Wang Decl. Ex. 8, at 1, 4.)  The Spruce Point Report disclosed that Spruce Point had a short position in IRSA and Cresud shares and that Spruce Point "[stood] to realize significant gains in the event" the price of IRSA or Cresud shares declined after its release.  (Wang Decl. Ex. 8, at 2.)  The Report also stated that Dolphin did not qualify as a VCO, and therefore IDBD's $6.7 billion of net debt should have been consolidated with IRSA's financial statements.  (*Id.* Ex. 8, at 5; CAC ¶ 110.)

On November 20, 2015, IRSA issued a public statement disputing the contents of the Spruce Point Report, affirming the accuracy of IRSA's financial statements, and confirming IRSA's compliance with its debt covenants.  (CAC ¶ 118.)  On November 24, 2015 IRSA released a more detailed response, stating that:

> At both June 30 and September 30, 2015, IRSA, IFISA and [Extra] were parties to a joint control agreement (the "Joint Control Agreement") with respect to their respective investments in IDBD.  Therefore, IRSA did not have effective control over [IDBD] on either of such dates.  For this reason, and in accordance with [the International Financial Reporting Standard], IRSA did not consolidate IDBD in its annual or most recent unaudited quarterly consolidated financial statements. . . .

> Due to the October 11 termination of the Joint Control Agreement, IRSA is currently assessing whether or not it should begin to consolidate [IDBD] commencing on the date as of which the Elsztain group (i.e., IFISA, IRSA and related companies) obtained effective control over IDBD.  No conclusion has been reached yet. . . . IRSA has carefully reviewed all its debt agreements and believes that it is in compliance with all applicable covenants and, assuming no increase in IRSA's shareholding in IDBD, will remain in compliance even if it consolidates IDBD in its future financial statements.

(Wang Decl. Ex. 10; *see also* CAC ¶¶ 119, 120.)

On December 30, 2015, IRSA announced that IRSA would "consolidat[e] IDBD in its financial statements since October 11, 2015, [the] date in which the group controlled by Eduardo Sergio Elsztain took effective control of IDBD."  (CAC ¶ 122; *see also* Wang Decl. Ex. 11.) IRSA's financial statements for 2015 consolidated IDBD as a subsidiary as of October 11, 2015. (Wang Decl. Ex. 12, at 9.)

## II.   **Procedural History**

On March 9, 2016, Plaintiff initiated this action in the Eastern District of Pennsylvania with the filing of his complaint.  (Doc. 1.)  On June 27, 2016, Defendants IRSA and Cresud moved to transfer venue to the Southern District of New York, (Doc. 2), which Plaintiff did not oppose, (Doc. 7).  On July 13, 2016, Judge Paul S. Diamond so-ordered the stipulation entered into by the parties to transfer the case to the Southern District of New York, (Doc. 8), and the case was transferred and assigned to me.[4]

On December 8, 2016, I granted Plaintiff's motion to appoint Stefan Sachsenberg as lead plaintiff pursuant to 15 U.S.C. § 78u-4(a)(2)(B) and The Rosen Firm, P.A. as lead counsel pursuant to § 78u-4(a)(2)(B)(v).  (Doc. 21.)  On February 13, 2017, Plaintiff filed the CAC.

---

[4] On August 4, 2016, I accepted *Tomka v. Cresud Sociedad Anónima Comercial, Inmobiliaria, Financiera y Agropecuaria et al.* ("Tomka Action"), No. 16-cv-5748, as related to this action, and that case was also transferred to me.  The parties in the Tomka Action stipulated to a stay pending the outcome of the instant motion to dismiss. (Doc. 25.)

(Doc. 24.)  On April 14, 2017, Movants filed the instant motion to dismiss the CAC, (Doc. 26), along with an accompanying memorandum of law, (Doc. 27), and a supporting declaration and exhibits, (Doc. 28).  On June 5, 2017, Plaintiff filed his opposition, (Doc. 29), and a supporting declaration and exhibits, (Doc. 30).  On June 7, 2017, Movants filed their reply in further support of their motion.  (Doc. 33.)

### III.   Legal Standard

#### A.   *Federal Rule of Civil Procedure 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.  *Kassner*, 496 F.3d at 237.  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal

conclusions." *Id.*

## B.     *Federal Rule of Civil Procedure 9(b) and the PSLRA*

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff

must meet to survive a motion to dismiss."[5]  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 99 (2d Cir. 2007).  Rule 9(b) requires a securities fraud claim to "state with particularity the

circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This standard also requires

that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  *ATSI*, 493 F.3d at 99.  "Allegations that are conclusory or

unsupported by factual assertions are insufficient."  *Id.*

The Private Securities Litigation Reform Act ("PSLRA") also imposes a heightened

pleading standard on securities fraud complaints.  *See* 15 U.S.C. § 78u-4(b); *Lewy v. SkyPeople*

*Fruit Juice, Inc.*, No. 11 Civ. 2700(PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012)

("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA.").  To

satisfy the PSLRA, a securities fraud complaint must "'specify' each misleading statement;" "set

forth the facts 'on which a belief' that a statement is misleading was 'formed;'" and "'state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-

4(b)).  Although a court ordinarily draws all reasonable inferences in favor of the plaintiff, the

PSLRA "'establishes a more stringent rule for inferences involving scienter' because the PSLRA

---

[5] To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that scienter—*i.e.*, a defendant's intention to deceive, manipulate, or defraud— must also be pleaded with particularity under the PSLRA).

### C.     *External Documents*

In evaluating a motion to dismiss in a securities action, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98.  Movants attach the following documents to their motion to dismiss:

- excerpts of IRSA's Form 20-F for the fiscal year ended June 30, 2014, dated October 31, 2014, (Doc. 28-1);

- excerpts of IRSA's Form 6-K, dated December 22, 2014, (Doc. 28-2);

- IRSA's Form 6-K, dated February 11, 2015, (Doc. 28-3);

- excerpts of IRSA's Form 6-K, dated April 9, 2015, (Doc. 28-4);

- excerpts of IRSA's Form 6-K, dated June 17, 2015, (Doc. 28-5);

- IRSA's Form 6-K, dated September 25, 2015, (Doc. 28-6);

- excerpts of IRSA's Form 20-F for the fiscal year ended June 30, 2015, dated November 17, 2015, (Doc. 28-7);

- Spruce Point Capital Management LLC's Investment Research Report, dated November 19, 2015, (Doc. 28-8);

- IRSA's Form 6-K, dated November 20, 2015, (Doc. 28-9);

- IRSA's Form 6-K, dated November 24, 2015, (Doc. 28-10);

- IRSA's Form 6-K, dated December 30, 2015, (Doc. 28-11);

- excerpts of IRSA's Form 6-K, dated May 31, 2016, (Doc 28-12);

- International Financial Reporting Standard 10 Consolidated Financial Statements ("IFRS 10"), (Doc. 28-13);

- IASB documents published to accompany IFRS 10 Consolidated Financial Statements, which contains the Basis for Conclusions on IFRS 10 Consolidated Financial Statements, (Doc. 28-14);

- International Accounting Standard 28 Investments in Associates and Joint Ventures ("IAS 28"), (Doc. 28-15).

In addition, Plaintiff attaches the following document to his opposition:

- excerpts of IRSA's Form 20-F for the fiscal year ended June 30, 2016, dated October 31, 2016, (Doc. 30-1).

These documents are incorporated by reference in the CAC and/or are legally required public disclosure documents filed with the SEC. Accordingly, I consider them in deciding the present motion, drawing all reasonable inferences in favor of Plaintiff.

### IV.  <u>Discussion</u>

Plaintiff seeks to hold IRSA and Cresud liable for securities fraud under Section 10(b) and Rule 10b-5. To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*, 552 U.S. at 157. Movants move to dismiss the CAC, arguing that Plaintiff fails to adequately allege (1) actionable misstatements or omissions, and (2) scienter. I agree.

A.    *Material Misstatement or Omission*

1.  **Applicable Law**

Rule 10b-5, promulgated under Section 10(b) of the Exchange Act, provides in pertinent part that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  With respect to omissions, "silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Stratte– McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  Thus, generally, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).  "Even in the absence of an independent duty to disclose information, once a company speaks on an issue, it has a duty to be accurate and complete." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017).

With respect to materiality, a misrepresentation or omission is material when "there is a substantial likelihood that a reasonable shareholder would consider [the stated or omitted fact] important in deciding how to act." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (quoting *Basic*, 485 U.S. at 231).  Courts determine whether a reasonable investor would have considered the statement or omission "significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  When considering an omission, the question becomes whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Hutchison*, 647 F.3d at 485 (quoting *TSC Indus., Inc. v.*

11

*Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Materiality is, however, a mixed question of law and fact, and a complaint may not be dismissed on the basis that the alleged misstatements or omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197 (quoting *Ganino*, 228 F.3d at 162).

## 2.  Application

Plaintiff alleges that Defendants made the following principal misrepresentations or omissions:  (1) IRSA failed to disclose that it controlled IDBD as of February 11, 2015 and failed to consolidate IDBD's financial results into its own; and (2) IRSA failed to disclose that it controlled IDBD through Dolphin.  Both of these alleged omissions turn on whether IRSA controlled IDBD as of February 11, 2015.

### a.  The Spruce Point Report

As an initial matter, Movants argue that I should not credit the allegations set forth in the CAC because they are merely copied and pasted from an unproven source—*i.e.*, the Spruce Report.  (IRSA Mem. 16–17.)[6]  However, courts in this Circuit have held that a short seller report "does not implicate the same skepticism as a traditional anonymous source."  *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (quoting *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012)).  Even though Spruce Point stood to realize significant gains if the price of IRSA or Cresud shares declined as a result of the Spruce Point Report, the truth of the Report is a factual dispute that is inappropriate for resolution at the motion to dismiss stage.  *See id.* (holding that a short seller's report was a

---

[6] "IRSA Mem." refers to Movants' Memorandum of Law in Support of Defendants IRSA Inversiones y Representaciones Sociedad Anónima and Cresud Sociedad Anónima Comercial, Inmobiliaria, Financiera y Agropecuaria's Motion to Dismiss, filed April 14, 2017.  (Doc. 27.)

sufficiently reliable factual source, even though the short seller held short positions in the defendant's stock.  Moreover, Plaintiff does not rely exclusively on the Spruce Point Report. *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214(HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("Plaintiffs do not rely solely on [a short seller report], and courts in this district frequently accept allegations based on short-seller reports at this stage in a case.").  Therefore, at this stage in the proceedings, I accept the Spruce Point Report as a sufficiently reliable factual source for Plaintiff's allegations in the CAC.

### b.  IRSA's Control of IDBD

At the core of the parties' dispute is when IRSA was required to consolidate IDBD into its financials.  Plaintiff alleges in the CAC that IRSA controlled IDBD as of February 11, 2015, and that IRSA's failure to disclose that control—as well as its subsequent failure to consolidate IDBD into its financials—constitutes a material misstatement or omission.  Movants argue that Plaintiff's allegations are belied by the same accounting standards on which the CAC purports to rely.  (*See* IRSA Mem. 11–15.)  The IFRS 10—which the parties agree governs here—states that the test for consolidation of a subsidiary is actual practical control over the subsidiary free of any "barriers (economic or otherwise) that prevent" an investor from exercising control, (Wang Decl. Ex. 13, ¶¶ B22, B23), and that an investor has a "[m]ajority of the voting rights but no power" where those voting rights are not substantive and the holder lacks the "practical ability to exercise" a majority of voting rights, (*id.* ¶¶ B22, B36).

Movants argue that IRSA was not required to consolidate IDBD until after the Rights Offering on February 10, 2015 because IRSA lacked the "practical ability" to exercise control over IDBD.  (*See* IRSA Mem. 11–15.)  Specifically, IRSA had a "majority of the voting rights but no power" because IRSA did not have the ability to appoint additional board members until

the arbitrator issued his award with respect to the BMBY clause.  Therefore, IRSA did not have power over IDBD until October 11, 2015, when IRSA regained control of the IDBD Board. Relying on the same IFRS 10 standard, Plaintiff argues that Extra's belief that it was necessary to enjoin IRSA in June 2015 from installing members to the IDBD Board is evidence that IRSA had the capability to change the composition of the Board prior to that date.  (*See* Pl. Opp. 12–13.)[7]  Thus, IRSA was required to consolidate IDBD as of February 11, 2015, and its failure to do so constitutes a material misstatement or omission.

Drawing all inferences in Plaintiff's favor, as I must, Plaintiff fails to allege that IRSA's failure to consolidate IDBD into its financials was a material misstatement or omission.  IRSA's alleged failure to consolidate IDBD turns on whether—and when—it had control over IDBD. Plaintiff argues that Dolphin had control over IDBD and could have appointed its directors any time before the arbitrator's injunction on July 6, 2015.  Plaintiff repeats this theory in his opposition, but this fact is not alleged in the CAC.  Plaintiff does not allege how Dolphin could have installed its directors before the arbitrator's award on October 11, 2015—either before or after the arbitrator's injunction on July 6, 2015.  Instead, the facts in the CAC concerning the arbitration show that IRSA never had the "practical ability to exercise" control over IDBD, free from "barriers (economic or otherwise) that prevent [IRSA] from exercising" that control. (Wang Decl. Ex. 13, ¶¶ B22, B23.)

Plaintiff's reliance on the arbitrator's injunction on July 6, 2015 does not save his claim. Plaintiff contends that, at the very least, IRSA had control over IDBD from February 11, 2015— when it held a majority of the common shares of IDBD—until July 6, 2015—when the arbitrator

---

[7] "Pl. Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendants IRSA and Cresud's Motion to Dismiss the Amended Class Action Complaint, filed June 5, 2017.  (Doc. 29.)

issued the injunction.  Plaintiff ignores that the next shareholders' meeting after February 11,

2015 was scheduled for July 7, 2015, and at that meeting, Dolphin could have ostensibly cast its

votes for its director nominees to the IDBD Board.  However, Extra sought and obtained an

injunction from the arbitrator on July 6, 2015, *i.e.*, prior to the date of the annual shareholders'

meeting, thereby blocking Dolphin's ability to exercise control.  The CAC does not otherwise

allege any way that Dolphin could have installed directors to the IDBD Board prior to the annual

shareholders' meeting, or otherwise exercise the necessary requisite control.

### c.   IRSA's Compliance with its Debt Covenants

Plaintiff also fails to plead any facts sufficient to allege a material misstatement or

omission regarding IRSA's compliance with its debt covenants.  Plaintiff makes no attempt to

respond to Defendants' argument that Plaintiff fails to plead that IRSA breached its debt

covenants, (IRSA Mem. 16), and appears to abandon this claim in his opposition.  *See Romeo &*

*Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442 (TPG)(FM), 2014 WL

4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is

limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's

arguments in support of dismissing that claim.").  That failure by itself is sufficient to warrant

accepting Movants' argument on this issue.  In any event, the CAC pleads virtually no facts

suggesting the plausibility of any such breach.  The Spruce Point Report—on which Plaintiff

relies—offers, at most, speculation that IRSA might have breached its debt covenants with

consolidation.  (*See* Wang Decl. Ex. 8, at 4 (citing "apparent covenant breach"); *id.* at 5

("[IRSA] appears to be in violation of its covenants . . . ."); *id.* (citing "risk of a covenant

breach"); *id.* at 6 (citing Spruce Point's "belief that [IRSA] is currently in violation of its debt

covenants").)  These equivocal allegations are insufficient to state a claim under Section 10(b),

or to create an inference that would support such a claim.  Moreover, it is undisputed that IDBD has been consolidated in the financials of IRSA since October 2015, and that no IRSA noteholder has ever declared breach of the debt covenant (or any other covenant) over the past two years.

For the foregoing reasons, I conclude that Plaintiff has not adequately pleaded a material misstatement or omission, which alone warrants dismissal of his claim for securities fraud under § 10(b) and Rule 10b-5.  I nevertheless turn to scienter, which provides an alternate basis for dismissal.

### B.    *Scienter*

#### 1.  Applicable Law

Pursuant to the PSLRA, a well-pleaded securities fraud claim must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313).  In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*

##### a.   Motive and Opportunity to Defraud

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff must allege that the defendant or its officers "benefitted in some concrete and personal way from the purported fraud."  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  "Motives that are common to most corporate officers, such as the desire for

the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*  Courts in this Circuit have held that the desire to comply with financial covenants in loan agreements is insufficient to support a strong inference of scienter through motive and opportunity.  *See, e.g.*, *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) ("[Defendant's] need to comply with various financial covenants in its loan agreements is similarly deficient as a motive allegation as they are common to most companies."), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 264–65 (S.D.N.Y. 2004) ("[T]he alleged desires to raise additional capital in a private placement or to maintain compliance with the financial covenants of a company loan agreement . . . are similarly inadequate to support an allegation of intent to commit fraud.").

### b.  Strong Circumstantial Evidence

As an alternative to the motive and opportunity to defraud, a plaintiff can raise a strong inference of scienter under the "strong circumstantial evidence" prong, requiring a plaintiff to show conscious misbehavior or recklessness.  *ECA*, 553 F.3d at 198.  Conscious misbehavior "encompasses deliberate illegal behavior," *Novak*, 216 F.3d at 308, whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 312).  If motive to commit fraud has not been shown, "the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

Additionally, a strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.   There are at least four circumstances that "may give rise to a strong inference of the requisite scienter:  where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'"   *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

### c.   The Core Operations Doctrine

Prior to the passage of the PLSRA, a plaintiff could allege scienter as to individual defendants and a company if the misleading statements and/or omissions related to a core operation of the company.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  However, since the enactment of the PSLRA, the Second Circuit has expressed doubt as to the continued independent viability of the core operations doctrine.  *See Mechel OAO*, 475 F. App'x at 356 ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter.").  The Second Circuit has commented that the doctrine can "provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order).  District courts in this Circuit have questioned the continued viability of the core operations doctrine following the PSLRA.  *See, e.g.*, *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) ("[T]here is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid." (internal quotation marks

omitted)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011)

(collecting cases).  Without more definitive guidance from the Second Circuit, I will apply the

modified approach followed by district courts in this Circuit, and consider the "core operations"

allegations to constitute a supplementary, but not an independent, means to plead scienter.  *See*

*Fialkov v. Alcobra Ltd.*, No. 14 Civ. 09906 (GBD), 2016 WL 1276455, at *7 (S.D.N.Y. Mar. 30,

2016) ("The majority of courts in the Second Circuit have found that the core operations doctrine

may provide support for but not an independent basis of scienter." (internal quotation marks

omitted)).  As a result, I will consider the core operations allegations as part of a "holistic

assessment of the scienter allegations."  *Shemian v. Research In Motion Ltd.*, No. 11 Civ.

4068(RJS), 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) (quoting *Mechel* OAO, 811 F.

Supp. 2d at 872), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

## 2.  Application

To establish a strong inference of scienter, Plaintiff proceeds solely on a theory under the

"strong circumstantial evidence" prong, arguing that the CAC adequately pleads conscious

misbehavior or recklessness.  (Pl. Opp. 19–23.)  Even though Plaintiff does not assert an

argument under the motive and opportunity to defraud prong, Plaintiff's allegations, taken as a

whole, fail to establish a strong inference of scienter under this prong.  Plaintiff fails to show that

Defendants "benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553

F.3d at 198.  The only potential motive in the CAC that could be construed as a concrete benefit

is that "IRSA wanted to avoid consolidating the financial statements of IDBD into its own,

because to consolidate would mean it was in breach of the debt covenants contained in its Global

Notes Indenture."  (CAC ¶ 50.)  But as courts in this Circuit have held, this alleged motive is

insufficient to support a strong inference of scienter under the "motive and opportunity" prong.

*See, e.g.*, *Mechel OAO*, 811 F. Supp. 2d at 867; *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256 at 264–65.

Plaintiff's allegations likewise fail to establish a strong inference of scienter under the "strong circumstantial evidence" prong.  Plaintiff primarily argues that IRSA was "minimally reckless in not knowing that it controlled IDBD for all practical purposes between February 10, 2015 and July 6[,] 2015, and that straightforward accounting principles required Defendants both to acknowledge that control and to consolidate IDBD's financial statement's into IRSA's."  (Pl. Opp. 20.)  This circular argument is insufficient to show conscious misbehavior or recklessness.

As with his argument as to material misrepresentation or omission, Plaintiff incorrectly contends that IRSA controlled IDBD for all practical purposes as of February 10, 2015.  As described above, to consolidate IDBD under IFRS 10, IRSA was required to have the "practical ability to exercise" control over IDBD, free from "barriers (economic or otherwise) that prevent [IRSA] from exercising" that control.  (Wang Decl., Ex. 13 (IFRS 10) ¶¶ B22, B23.)  Plaintiff repeatedly emphasizes that the arbitrator's injunction was only imposed on July 6, 2015, and that therefore IRSA controlled IDBD until at least that point in time.  (Pl. Opp. 20.)  The arbitrator's injunction, however, was imposed before the shareholders' meeting at which Dolphin would have apparently had its first opportunity to vote for its director nominees.  The injunction stopped Dolphin from voting for its own directors to replace Extra's directors.  Thus, Dolphin did not have the practical ability to exercise control over IDBD between February 10, 2015 and July 6, 2015, and it did not gain such control until October 2015.  There are also no allegations that support an inference that had the meeting been scheduled earlier Extra could not have sought an injunction from the arbitrator at an earlier date.

Plaintiff also argues that IDBD is part of IRSA's "core operations." (*Id.* at 21.) However, Plaintiff's allegation that a misstatement concerned IRSA's core operations, on its own, is insufficient to show recklessness. *See Fialkov*, 2016 WL 1276455, at *7. Therefore, without other evidence of conscious misbehavior or recklessness, Plaintiff cannot exclusively rely on the "core operations" doctrine to save his claim.[8]

Although I have rejected all of Plaintiff's scienter arguments individually, I must still consider whether the allegations and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs*, 551 U.S. at 322–23. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. At most, and taken as a whole, the CAC shows that Defendants knew that Dolphin purchased a majority of IDBD shares and that Defendants hoped to obtain control over IDBD in Dolphin's dispute with Extra. Plaintiff fails to provide any basis for a conclusion that Defendants had a motive to defraud, and its allegations of conscious misbehavior or recklessness are virtually nonexistent. Although scienter allegations "need not be irrefutable," or "even the most plausible of competing inferences," to withstand a motion to dismiss, *Tellabs*, 551 U.S. at 324 (internal quotation marks omitted), the CAC's allegations do not meet the heightened standards of Rule 9(b) and the PSLRA. In other words, I find that any reasonable shareholder would deem the inference of scienter to be far less compelling than an inference of, at most, non-actionable mismanagement and negligence on the part of Defendants. Accordingly, Plaintiff fails to adequately allege scienter, and his claim under Section 10(b) and Rule 10b-5 must be dismissed.

---

[8] Furthermore, it appears that IDBD was not part of IRSA's core operations as of February 2015. Rather, IDBD was an investment of IRSA held jointly with Extra, and Dolphin did not appoint a majority of the IDBD Board until October 2015. The only document that Plaintiff cites to support his assertion that IDBD is part of IRSA's core operations is an SEC filing from June 2016, more than a year after the transaction at issue.

### C.  *Section 20(a)*

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling persons' of a company, are secondarily liable for their company's violations of the Exchange Act." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78t(a)).  Because the CAC fails to adequately plead a primary violation under Section 10(b), there is no basis for a primary violation upon which any Section 20(a) claim might be predicated.  Consequently, Movants' motion to dismiss Plaintiff's claim brought pursuant to Section 20(a) against Cresud is also granted.[9]

---

[9] In his opposition, Plaintiff contends that his "[§] 20(a) claim cannot be dismissed against Elsztain[] and Zang." (Pl. Opp. 25.)  However, as noted above, Defendants Elsztain and Zang were not served in this action; therefore, I have not addressed Movants' motion as it relates to them.

## V.     <u>**Conclusion**</u>

For the foregoing reasons, IRSA and Cresud's motion to dismiss is GRANTED.  The

Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 26), and enter

judgment for IRSA and Cresud.

With regard to the Individual Defendants, as detailed above, Plaintiff's letter regarding

service against the Individual Defendants is due on or before September 24, 2018.  The parties

are also directed to file a joint letter in the Tomka Action on or before October 5, 2018 that (i)

addresses the effect of this Opinion & Order on the claims alleged in and status of that case and

(ii) proposes next steps.

SO ORDERED.

Dated:  September 10, 2018
          New York, New York

Vernon S. Broderick
United States District Judge